**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**PATRICIA ARNOLD,**

                                                      **Plaintiff,**

          **vs.**                                                                                **5:20-CV-1364**
                                                                                                        **(MAD/ML)**

**TOWN OF CAMILLUS, et. al.,**

                                                      **Defendants.**
_____

**APPEARANCES:**                                        **OF COUNSEL:**

**BOSMAN LAW FIRM, LLC**                         **AJ BOSMAN, ESQ.**
3000 McConnellsville Road                          **ROBERT J. STRUM, ESQ.**
Blossvale, New York 13308
Attorneys for Plaintiff

**BOND, SCHOENECK & KING, PLLC**            **DAVID M. FERRARA, ESQ.**
One Lincoln Center                                     **KSENIYA PREMO, ESQ.**
Syracuse, New York 13202                           **HANNAH K. REDMOND, ESQ.**
Attorneys for Defendants
except for John and Jane Doe(s)

**Mae A. D'Agostino, U.S. District Judge:**

**MEMORANDUM-DECISION AND ORDER**

**I. INTRODUCTION**

          On October 13, 2020, Plaintiff Patricia Arnold commenced this action in Onondaga

County New York Supreme Court.  *See* Dkt. No. 2.  On November 4, 2020, Defendants removed

the action to this Court pursuant to 28 U.S.C. § 1441(a).  *See* Dkt. No. 1 at ¶ 7.

          In her initial complaint, Plaintiff asserted claims for discrimination and retaliation because

of her gender in violation of 42 U.S.C. § 1983 and the New York State Human Rights Law

("NYSHRL") against Defendants Town of Camillus (the "Town"); Camillus Police Chief Thomas

1

Winn; Camillus Police Captain James Nightingale; Town Supervisor Mary Ann Coogan; Camillus Town Board members David Callahan, Joy Flood, Dick Griffo, Steven James, Mike LaFlair, and Mary Lubar; John Doe(s); and Jane Doe(s). *See* Dkt. No. 2 at ¶¶ 35-48. Plaintiff also asserted a claim for intentional or reckless infliction of emotional distress against Defendant Nightingale. *See id.* at ¶¶ 49-52. Lastly, Plaintiff asserted claims for tortious interference and *prima facie* tort against Defendants Nightingale and Winn. *See id.* at ¶¶ 53-59.

On July 16, 2021, this Court granted Plaintiff's motion to remand her state law claims to Onondaga County Supreme Court so that she could file a motion for leave to file a late notice of claim. *See* Dkt. No. 42. This Court retained jurisdiction over Plaintiff's federal claims and stayed the case pending a decision on Plaintiff's motion in state court. *See* Dkt. No. 44. On January 7, 2022, the Onondaga County Supreme Court denied Plaintiff's motion for leave to file a late notice of claim and dismissed her state law claims. *See* Dkt. No. 49-1.

On May 3, 2022, Plaintiff filed an amended complaint. *See* Dkt. No. 56. Defendants filed a motion to dismiss the amended complaint. *See* Dkt. No. 57. In a March 9, 2023, Memorandum-Decision and Order, the Court granted in part and denied in part Defendants' motion, dismissing Plaintiff's claims for intentional or reckless infliction of emotional distress against Defendant Nightingale and *prima facie* tort and tortious interference against Defendants Winn and Nightingale. *See* Dkt. No. 61 at 34-38. The Court further found that Plaintiff "failed to plausibly allege a custom or policy that could support" imposing municipal liability on the Town but concluded that Plaintiff plausibly alleged that the Town was subject to *Monell*[1] liability for Defendants Winn and Coogan's alleged failure to properly investigate Plaintiff's complaints. *Id.* at 15-16. The Court also granted Defendants' motion to dismiss pertaining to Plaintiff's § 1983

---

[1] *Monell v. Dep't of Social Servs.*, 436 U.S. 658 (1978).

claims against Defendants Winn, Coogan, and the Town Board Members. *See id.* at 17-24. Finally, the Court dismissed Plaintiff's NYSHRL claims against the individual Defendants because of Plaintiff's failure to serve a notice of claim. *See id.* at 25-30.

Defendants Nightingale and the Town filed a motion for summary judgment with this Court on December 15, 2023. *See* Dkt. No. 92. However, on December 22, 2023, the New York State Supreme Court Appellate Division, Fourth Judicial Department modified the Onondaga County Supreme Court's Order and granted Plaintiff leave to serve a late notice of claim pertaining to her state law claims. *See* Dkt. No. 93-1. Plaintiff subsequently filed a notice of claim with the Camillus Town Clerk on December 27, 2023. *See* Dkt. No. 93-2. On January 11, 2024, this Court granted Plaintiff permission to amend her complaint to reinstate her state law claims that were addressed by the Fourth Department. *See* Text Minute Entry 01/11/2024.

Plaintiff filed a second amended complaint on January 22, 2024. *See* Dkt. No. 96. In her second amended complaint, Plaintiff asserts § 1983 claims against Defendants Nightingale and the Town for gender discrimination and retaliation. *See id* at ¶¶ 42-49. Plaintiff also sets forth claims under NYSHRL alleging gender discrimination and retaliation against all Defendants. *See id.* at ¶¶ 50-56. Generally, Plaintiff alleges that she was subjected to unwanted physical contact from Defendant Nightingale, and she was treated less favorably than male police officers based on a lack of training and instructional opportunities. *See id.* at ¶¶ 13-41.

Thereafter, the Court granted Defendants' request to withdraw their original memorandum of law in support of their motion for summary judgment to file a new memorandum of law addressing all of Plaintiff's claims, including her reinstated state law claims. *See* Dkt. Nos. 103, 104. Defendants filed a memorandum of law in support of their motion for summary judgment on

April 10, 2024.  *See* Dkt. No. 105.  Plaintiff responded in opposition and Defendants replied.  *See* Dkt. Nos. 110, 113.

Presently before the Court is Defendants' motion for summary judgment and Plaintiff's opposition to that motion.  For the following reasons, Defendants' motion for summary judgment is granted, and Plaintiff's case is dismissed in its entirety.

## II. BACKGROUND

From April 4, 2011, until August 7, 2019, Plaintiff was employed by the Town as a Police Officer.  *See* Dkt. No. 109-22 at ¶ 1.[2]  Plaintiff contends that she resigned from this position to protect her health, but Defendants assert that her resignation was "voluntary."  *Id.*

The parties agree that, during the course of her employment, Plaintiff received training on numerous topics and that all officers in the department had more than minimal training.  *Id.* at ¶¶ 3-4.  Plaintiff denies, however, that she "had as much or more training opportunities than men in the department."  *Id.* at ¶ 4.  Plaintiff contends that she was ignored or not allowed to participate in several trainings such as "SPEAR"[3] and "Street Survival" trainings.  *Id.*  Plaintiff states that male officers were given these opportunities, but that she was told she could not attend "Street Survival" training "because they would have to get two separate hotel rooms because she is female and could not share a room."  *Id.*  Plaintiff agrees that Defendants sought Plaintiff out for many training opportunities, particularly those which focused on elder abuse and mental health.  *See id.* at ¶ 5.  The parties also agree that "Plaintiff was [] invited to participate in the Honor

---

[2] Pursuant to Local Rule 56.1(a), Defendants filed a statement of material facts in support of their motion for summary judgment.  *See* Dkt. No. 92-13.  Plaintiff also complied with Local Rule 56.1(b) and submitted a response to the statement of material facts.  *See* Dkt. No. 109-22.  The factual background herein is derived primarily from these submissions.
[3] During Plaintiff's deposition, she stated she could not remember what "SPEAR" stood for but that it was a defensive tactics training.  *See* Dkt. No. 109-11 at 200.

Guard and was active in developing the Town's Cadet program." *Id.* at ¶ 6.  Plaintiff became

certified as a General Topics, Academy, and Mental Health First Aid Instructor.  *See id.* at ¶ 7.

Defendants contend that Defendant Winn "invited" Plaintiff to attend a week-long Mental Health

First Aid training in Florida.  *Id.*  Plaintiff disputes this and asserts that Lieutenant Daniel

Burlingame was responsible for arranging and suggesting the training to Plaintiff.  *See id.*

Burlingame corroborates Plaintiff's assertion in his affirmation.  *See* Dkt. No. 109-17 at ¶ 8.

Plaintiff admits that she "is unfamiliar with other Officers' training records and lacks

knowledge of anyone who received more training opportunities than she did."  Dkt. No. 109-22 at

¶ 8.  Defendants claim that Defendant Nightingale was not responsible for approving or denying

training requests made by Plaintiff or the assignment of her overtime.  *See id.* at ¶ 9.  In dispute of

this, Plaintiff asserts that "Nightingale was responsible for fielding and forwarding all requests for

training which he failed to do for Plaintiff."  *Id.*  Defendants contend that Defendant Winn was

responsible for approving or denying training requests, but Plaintiff states that Defendant Winn

was only responsible for approving trainings which had an expense that had to be approved by the

Town.  *See id.* at ¶ 10.  Plaintiff asserts that the Town's own policy places the responsibility of

assigning training "squarely in Nightingale's lap."  *Id.* at ¶ 10 (citing Dkt. No. 109-4).  The Town

policy that Plaintiff provided states that "training will be assigned, tracked and administered by

the department training supervisor."  Dkt. No. 109-4 at 3.  While this is the Town's policy,

Defendant Nightingale states in his deposition that he was "in charge of keeping track of training,

not who goes to training[.]"  Dkt. No. 109-20 at 70.  Defendant Nightingale further asserts that he

was in charge of "keeping track of training" as Sergeant, but in August of 2018 when he was

promoted to Captain, he became responsible for scheduling training.  *Id.* at 70-72.  He contends

that the decisions regarding the approval or denial of training requests were "[u]ltimately up to the chief of police." *Id.* at 72.

Regarding instructional opportunities, Defendants assert that "Plaintiff was given several opportunities to provide instruction" including opportunities instructing ethics and sexual harassment trainings at the Academy, sexual harassment training with the Town's secretaries, mental health first aid training to the Town Police Department, and "Below 100 Instructor" training for a joint-agency group. Dkt. No. 109-22 at ¶ 11. Plaintiff denies this and contends that despite becoming certified as an instructor in 2014, she was not afforded opportunities to instruct until 2018. *Id.* She asserts that the opportunities she was afforded included providing sexual harassment training to three secretaries and a one-day mental health first aid training which was scheduled immediately after she told Defendant Winn that she was leaving the Department. *See id.* While Defendants claim that Defendant Nightingale invited Plaintiff to provide the "100 Below" training and asked if she would be interested in providing crisis intervention training ("CIT"), Plaintiff states that she never provided "100 Below" training and that she was only asked about CIT training after she complained about Defendant Nightingale. *See id.* at ¶ 12; *see also* 109-20 at 21. According to Defendants, Plaintiff lacked SPEAR training and never made any requests to receive the training, but Plaintiff argues that this was only because she was never notified of the training. *See* Dkt. No. 109-22 at ¶ 13.

In February of 2018, Plaintiff first reported to Defendant Winn that Defendant Nightingale had engaged in unwanted physical contact with Plaintiff by touching her arm and back during two separate firearm training sessions that occurred in 2017 and touching her shoulder on another unspecified occasion. *See id.* at ¶ 14-15. Defendants contend that Plaintiff told Defendant Winn that the contact was of a non-sexual nature but made her uncomfortable. *See id.* at ¶ 14. Plaintiff

asserts that she identified the harassment as "sexual" on an annual evaluation form "but was too fearful to turn" it in. *Id.*

Defendants contend that Plaintiff asked that her concerns be kept confidential, she was adamant she did not want the matter to be further pursued, and she reaffirmed this in her February 2019 evaluation. *See id.* at ¶ 16. Plaintiff asserts that she was not adamant and that she declined to file a formal complaint at her 2018 evaluation out of fear of retaliation. *See id.* Plaintiff states that she "repeatedly told Winn she was afraid of what will happen if she makes a formal complaint." *Id.* She further contends that Defendant Winn told her "that he would place a 'summary' of her complaint in a sealed envelope in her personal file." *Id.* Defendants state that Defendant Winn assured Plaintiff that she was protected against retaliation and instructed her to report additional concerns to himself or a supervisor. *See id.* at ¶ 17. Plaintiff disputes this, maintaining that Defendant Winn did not speak of protecting her at the February 2018 meeting, appeared annoyed, and did nothing to reassure her. *See id.*

On January 24, 2019, Plaintiff and Defendant Winn met for Plaintiff's 2018 annual performance review. *See id.* at ¶ 18. At this meeting, Plaintiff reported two more incidents involving Defendant Nightingale and expressed her fear of retaliation. *See id.* at ¶¶ 17-18. Defendants assert that Defendant Winn reassured Plaintiff that she was protected from retaliation and reminded her to report any concerns that may arise. *See id.* Plaintiff contends that Defendant Winn was "visibly angry and yelled at her" when Plaintiff expressed her fear. *Id.* at ¶ 17. In her second amended complaint, Plaintiff claims that "Winn became hostile and aggravated" when she stated her intention to file a formal complaint at this meeting. Dkt. No. 96 at 6. However, Plaintiff "admits" in her response to Defendants' statement of material facts that "Winn assured

Plaintiff that she would be protected against retaliation, [and] he reminded her to report any further concerns of unwanted conduct." Dkt. No. 109-22 at ¶ 18.

At Defendant Winn's request, Plaintiff submitted a written statement on February 6, 2019, regarding Defendant Nightingale's "unwanted conduct and behavior" that occurred between March 22, 2017, and January 17, 2019.  *Id.* at ¶ 19.  In their respective memoranda of law, the parties agree that there are six dates listed in the written statement on which Plaintiff alleges having had an offensive interaction with Defendant Nightingale.  *See* Dkt. No. 105 at 21; Dkt. No. 110 at 7.

On the form, Plaintiff was asked, "During 2018 have you been, or are you currently the victim of Sexual Harassment?"  Dkt. No. 109-2 at 2.  Both "yes" and "no" are circled, but "yes" also has an "x" through it.  *Id.*  The word "Sexual" has a line across it and Plaintiff wrote her initials.  *Id.*  She wrote, "on multiple dates, a supervisor unnecessarily touched my arm, should or back."  *Id.*  She included narrative explanations for such occurrences on six different dates.  *See id.* at 5.  Specifically, Plaintiff wrote that on her "first record of personal documentation," she "realized and began to note that Nightingale was touching only me.  He did not make any physical contact, of any kind, with anyone else."  *Id.*  She did not describe the touching.  *See id.*  The other five instances included touching Plaintiff's "right arm with his left arm," standing behind her and laying "his right hand on [her] right shoulder," touching and resting "his hand on [her] upper back and shoulder," touching her "with his right hand on [her] back and lightly rub[ing her] back," and touching her "left elbow and forearm with his right hand and elbow."  *Id.*  These instances occurred when Plaintiff was in training, Nightingale was showing her something on his phone, or he was sitting next to her at a meeting.  *See id.*  The dates are as follows: April 3, 2017, May 15, 2017, August 11, 2017, September 29, 2017, October 10, 2018, and January 17, 2019.  *See id.*

Defendants argue that Plaintiff's April 2017 incident does not contain allegations of any specific physical contact or a recounting of what occurred and should therefore not be considered in the Court's consideration of Plaintiff's allegations of sexual harassment.  *See* Dkt. No. 105 at 21, n.8; *see also* Dkt. No. 109-2 at 5.  According to Defendants, Plaintiff only "now claims" that the conduct and behavior alleged in this action was sexual harassment, but Plaintiff contends that she stated that the conduct and behavior was "continuing" sexual harassment when she made her written statement.  Dkt. No. 109-22 at ¶ 19.  Plaintiff avers that Defendant Winn "had Plaintiff cross out the word 'sexual' on the first page of the form."  *Id.* at ¶ 17.  Plaintiff's desired resolution was for Defendant Nightingale's "unwanted behavior" to stop, and she verbally reiterated this to Defendant Winn.  *Id.* at ¶ 20.

In response to Plaintiff's harassment complaint, Defendants contend that Defendant "Winn investigated the alleged acts of 'unwanted behavior' and addressed Plaintiff's concerns with Nightingale."  *Id.* at ¶ 21.  Defendants assert that Defendant Nightingale acknowledged that the alleged physical contact could have unknowingly occurred while he instructed Plaintiff but that he did not recall touching Plaintiff except for two occasions.  *See id.*  Plaintiff states that she cannot confirm nor deny these assertions because she was not present for the conversation.  *See id.*

According to Defendants, Defendant Nightingale admitted to Defendant Winn that he tapped Plaintiff's elbow during a January 2019 meeting to get her attention and patted her on the upper back after he shared news of a colleague's cancer diagnosis in October of 2018.  *See id.* at ¶ 22.  Defendants state that "Nightingale confirmed Plaintiff's report that none of these physical interactions were of a sexual nature or motivated by any sexual desire."  *Id.*  Plaintiff denies these assertions and contends that "Nightingale was joking and laughing with the Chief from Baldwinsville while he continuously was tapping Plaintiff's arm" and that she told Defendant

Nightingale to stop and move away from him. *Id.* Plaintiff also states that "Nightingale was rubbing [her] back, not just patting her on her upper back." *Id.* Plaintiff denies that Defendant Nightingale's behavior was not motivated by sex because he never touched male officers in the same way. *See id.*

Regarding the remainder of Plaintiffs allegations of unwanted behavior, Defendant Nightingale asserts that any other physical contact with Plaintiff was not done "knowingly, intentionally, or purposefully" on his part. *Id.* at ¶ 23; Dkt. No. 92-12 at ¶ 5. Plaintiff argues that the repeated touching could "not be fairly characterized as casual or unintentional." Dkt. No. 109-22 at ¶ 23. Defendants contend that Defendant Winn told Defendant Nightingale that regardless of the nature of the touching, it must stop, there was to be no retaliation against Plaintiff, and he was to have no physical contact with her, even during trainings. *See id.* at ¶ 24. Plaintiff could not confirm nor deny these assertions because she was not present for the conversation. *See id.*

After the conversation with Defendant Nightingale, Defendants state that Defendant Winn spoke with Plaintiff and informed her that Defendant Nightingale was directed to no longer have physical contact with her. *See id.* at ¶ 25. Defendants attest that Defendant Winn told Plaintiff that she was to report to him or a supervisor if any unwanted contact occurred or if she was retaliated against. *See id.* Plaintiff denies these contentions and asserts that in 2019, Defendant Winn only "told Plaintiff she no longer had to deal with Nightingale and she was to report to Lt. Burlingame." *Id.* Plaintiff agrees that following Defendant Winn's discussion with Defendant Nightingale, all of the unwanted conduct ceased. *See id.* at ¶ 26.

Plaintiff and Defendants concur that Plaintiff did not suffer retaliation from Defendant Nightingale. *See id.* at ¶ 27. However, Plaintiff asserts that she was retaliated against by Defendants Winn, Coogan, and the Town through their refusal to "investigate, interview or

consult with any witnesses [she] identified," by suggesting that Defendant Nightingale did not act intentionally, and by refusing to discipline Defendant Nightingale. *Id.*

Defendants contend that Plaintiff continued to work for the Town, without further incident, until her "voluntary" resignation on August 7, 2019, to take a job with the City of Syracuse Police Department. *Id.* at ¶ 28. Plaintiff disputes that her resignation was voluntary and instead asserts that her resignation was to "protect her health." *Id.* Defendants aver that Plaintiff "stated that she was leaving to pursue opportunities at [a] much larger police department." *Id.* at ¶ 29. Plaintiff denies that she ever said this. *See id.* In a resignation letter, which Defendants assert was "unsolicited," Plaintiff wrote as follows:

> I would like to sincerely convey my appreciation to you and this department as I have had tremendous experiences and opportunity. I am extremely grateful for the trust and responsibility that you placed on me as it assisted me in growing as an officer and a person. Thank you for all of your support and assistance in this law enforcement journey.

*Id.* at ¶ 30; *see also* Dkt. No. 92-6. Plaintiff disputes that the letter was unsolicited because she "was told she had to submit a letter." Dkt. No. 109-22 at ¶ 30.

### III. DISCUSSION

**A.   Summary Judgment Standard**

A court may grant a motion for summary judgment only if it determines that there is no genuine issue of material fact to be tried and that the facts as to which there is no such issue warrant judgment for the movant as a matter of law. *See Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 36 (2d Cir. 1994) (citations omitted). When analyzing a summary judgment motion, the court "cannot try issues of fact; it can only determine whether there are issues to be tried." *Id.* at 36-37 (quotation and other citation omitted).

11

In assessing the record to determine whether any such issues of material fact exist, the court is required to resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party. *See Chambers*, 43 F.3d at 36 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)) (other citations omitted). Where the non-movant either does not respond to the motion or fails to dispute the movant's statement of material facts, the court must be satisfied that the citations to evidence in the record support the movant's assertions. *See Giannullo v. City of N.Y.*, 332 F.3d 139, 143 n.5 (2d Cir. 2003) (failing to verify the assertions made in summary judgment motion with citations to the record "would derogate the truth-finding functions of the judicial process by substituting convenience for facts").

The moving party bears the initial burden of establishing that there is no genuine issue of material fact to be decided. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). With respect to any issue on which the moving party does not bear the burden of proof, it may meet its burden on summary judgment by showing that there is an absence of evidence to support the nonmoving party's case. *See id.* at 325. Once the movant meets this initial burden, the nonmoving party must demonstrate that there is a genuine unresolved issue for trial. *See* FED. R. CIV. P. 56(e). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

**B.    Gender Discrimination**

Plaintiff raises equal protection claims against Defendants Nightingale and the Town under § 1983 alleging discrimination and retaliation based on her gender. *See* Dkt. No. 96 at ¶¶ 42-45. "Section 1983 provides a federal cause of action against any person who, acting under color of state law, deprives another of his federal rights." *Conn v. Gabbert*, 526 U.S. 286, 290 (1999) (citing 42 U.S.C. § 1983). "[Section] 1983 and the Equal Protection Clause protect public

employees from various forms of discrimination, including hostile work environment and disparate treatment, on the basis of gender." *Demoret v. Zegarelli*, 451 F.3d 140, 149 (2d Cir. 2006).

Plaintiff also brings claims under the NYSHRL against all Defendants, alleging she suffered discrimination and retaliation because of her gender. *See* Dkt. No. 96 at ¶¶ 50-52. The NYSHRL provides that "[i]t shall be an unlawful discriminatory practice . . . [f]or an employer or licensing agency, because of an individual's . . . sex, . . . to discriminate against such individual in compensation or in terms, conditions or privileges of employment." N.Y. EXEC. LAW § 296(a).

Section 1983 and NYSHRL discrimination claims are evaluated under the same standards as Title VII claim.[4] *See Chick v. Cnty. of Suffolk*, 546 Fed. Appx. 58, 59 (2d Cir. 2013) ("Section 1983 employment discrimination claims asserted as equal protection violations are evaluated under the same standards as Title VII claims"); *Salamon v. Our Lady of Victory Hosp.*, 514 F.3d 217, 226 n.9 (2d Cir. 2008), *as amended* (Apr. 22, 2008) ("We typically treat Title VII and NYHRL discrimination claims as analytically identical, applying the same standard of proof to both claims"). Because the claims are subject to the same standards, § 1983 and NYSHRL discrimination claims are analyzed under the burden-shifting framework set forth for Title VII claims in *McDonnel Douglas Corp. v. Green*, 411 U.S. 792, 802-03 (1973). *See Camarda v. Selover*, 673 Fed. Appx. 26, 28 (2d Cir. 2006). "Under this framework, the 'plaintiff must first establish a *prima facie* case by demonstrating that: (1) she is a member of a protected class; (2) her job performance was satisfactory; (3) she suffered adverse employment action; and (4) the action occurred under conditions giving rise to an inference of discrimination.'" *Stoddard v.*

---

[4] Title VII "makes it unlawful for an employer to discriminate against any individual with respect to the compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1).

*Eastman Kodak Company*, 309 Fed. Appx. 475, 478 (2d Cir. 2009) (quoting *Demoret v. Zegarelli*, 451 F.3d 140, 151 (2d Cir. 2006)).  If the plaintiff establishes a *prima facie* case, "the burden shifts to the defendant to articulate 'some legitimate, nondiscriminatory reason' for its action." *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 106 (2d Cir. 2010) (quoting *McDonnel Douglas*, 411 U.S. at 802)).  "The final and ultimate burden is on the plaintiff to establish that the defendant's reason is in fact pretext for unlawful discrimination." *Abrams v. Dept. of Public Safety*, 764 F.3d 244, 251 (2d Cir. 2014).

Although § 1983 and NYSHRL claims track the burden shifting framework applied to Title VII claims, "a plaintiff advancing a claim pursuant to § 1983 must plausibly allege that 'the alleged deprivation was committed by a person acting under color of state law.'" *Naumovski v. Norris*, 934 F.3d 200, 212 (2d Cir. 2019) (quotation omitted).  Also, unlike Title VII claims, which may only be brought against an employing entity, "a § 1983 claim 'can be brought against an[y] individual' responsible for the discrimination." *Id.*  While a defendant may be liable under Title VII for "discriminatory conduct that can be properly attributed to the employer through agency principles, § 1983 does not permit such vicarious liability." *Id.*  An individual defendant must have "personally violated a plaintiff's constitutional rights" to be held liable under § 1983. *Id.*  The same is true for claims brought under the NYSHRL.  *See Boger v. New York State Office of Parks, Recreation & Historic Preservation*, No. 5:17-CV-00289, 2019 WL 2766897, *11 (N.D.N.Y. July 2, 2019) ("[I]ndividuals . . . may be liable under the NYSHRL if they were personally involved in the conduct giving rise to the claim").  Additionally, "a claim for employment discrimination under § 1983 rather than Title VII must establish that the defendant's discriminatory intent was a 'but-for' cause of the adverse employment action or the hostile environment.  It is insufficient to establish simply that invidious discrimination was 'a motivating

factor' of the offending conduct." *Naumovski*, 934 F.3d at 213.  As such, for a § 1983 claim to

survive a motion for summary judgment, when viewed in the light most favorable to the plaintiff,

the evidence must be such that "a reasonable jury could find that the adverse employment action

would not have occurred 'but-for' sex discrimination." *Id.* at 214.

"Accordingly, at the third step of the *McDonnell Douglas* analysis, a plaintiff asserting a §

1983 claim bears a higher burden in establishing that the employer's alternative,

nondiscriminatory reason for the adverse employment action is 'pretextual.'" *Id*.  "[U]nder §

1983, a plaintiff must establish that the employer's stated reason would not, alone, constitute a

sufficient basis for pursuing an adverse action." *Id.* at 215.  A plaintiff "must establish that the

employer's stated non-discriminatory reason is either false or inadequate to support the adverse

employment action." *Id.*

### 1. Hostile Work Environment

#### a. Severe and Pervasive Conduct

Defendants argue that Plaintiff's § 1983 and NYSHRL hostile work environment claims

fail as a matter of law because the conduct complained of was not severe or pervasive enough to

alter Plaintiff's employment.  *See* Dkt. No. 105 at 13-18.  Plaintiff contends that Defendant

Nightingale's conduct was "severe in nature" and "pervasively impacted" her working conditions

and therefore her hostile work environment claims must be allowed to proceed to trial.  Dkt. No.

110 at 13.

"The standard for showing a hostile work environment under Title VII, [], Section 1983,

and the New York State Human Rights Law is essentially the same." *Smith v. Town of*

*Hempstead Dept. of Sanitation Sanitary Dist. No. 2*, 798 F. Supp. 2d 443, 451 (E.D.N.Y. 2011)

(citing *Schiano v. Quality Payroll Systems, Inc.*, 445 F.3d 597, 609 (2d Cir. 2006); *Patterson v.*

*County of Oneida, N.Y.*, 375 F.3d 206, 225 (2d Cir. 2004)).  As such, the Court will

simultaneously analyze Plaintiff's § 1983 and NYSHRL hostile work environment claims.  *See*

*Williams v. New York City Housing Authority*, 61 F.4th 55, 70 (2d Cir. 2023) (analyzing state and

federal hostile work environment claims under the same standards).

 "A hostile work environment exists '[w]hen the workplace is permeated with

discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the

conditions of the victim's employment.'" *Torres v. Pisano*, 116 F.3d 625, 630-31 (2d Cir. 1997)

(quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)).  "A plaintiff must show not only

that she subjectively perceived the environment to be abusive, but also that the environment was

objectively hostile and abusive." *Dermot v. Zegarelli*, 451 F.3d 140 (2d Cir. 2006) (citing *Hayut

v. State Univ. of N.Y.*, 352 F.3d 733, 745 (2d Cir. 2003)).  "Generally, 'incidents must be more

than episodic; they must be sufficiently continuous and concerted in order to be deemed

pervasive.'" *Id.* at 149 (quoting *Alfano v. Costello*, 294 F.3d 365, 374 (2d Cir. 2002)).  However,

"harassing conduct does not need to be both severe and pervasive.  One instance of conduct that is

sufficiently severe may be enough." *Jackson v. County of Racine*, 474 F.3d 493, 499 (7th Cir.

2007); *see also Alfano*, 294 F.3d at 374 ("In short, a plaintiff alleging a hostile work environment

'must demonstrate either that a single incident was extraordinarily severe, or that a series of

incidents were "sufficiently continuous and concerted" to have altered the conditions of her

working environment'") (quotation omitted).

 "[W]hether an environment is 'hostile' or 'abusive' can be determined only by looking at all

the circumstances." *Harris*, 510 U.S. at 23.  Circumstances "may include the frequency of the

discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere

offensive utterance; and whether it unreasonably interferes with an employee's work

performance." *Id.*  Evidence of psychological harm may also be considered in this analysis but is not required for there to be a finding that a work environment is hostile.  *See id.* at 22-23; *see also Banks v. General Motors, LLC*, 81 F.4th 242, 267-68 (2d Cir. 2023).  Finally, "it is 'axiomatic' that in order to establish a sex-based hostile work environment under [§ 1983], a plaintiff must demonstrate that the conduct occurred because of her sex." *Alfano*, 294 F.3d at 374 (citing *Brown v. Henderson*, 257 F.3d 246, 252 (2d Cir. 2001)); *see also Gallagher v. Unified Ct. Sys.*, No. 3:18-CV-01476, 2024 WL 985097, *16 (N.D.N.Y. Mar. 7, 2024).

Plaintiff presents evidence that suggests Defendant Nightingale's physical touching was motivated by her gender.  The affirmations of several male officers support the contention that Defendant Nightingale subjected Plaintiff to touching that the male officers were not subjected to. *See* Dkt. No. 109-15 at ¶¶ 3-7; Dkt. No. 109-16 at ¶¶ 2-5; Dkt. No. 109-17 at ¶¶ 2-5; Dkt. No. 109-18 at ¶¶ 4-7.  In Matthew Cobb's affirmation, he asserted that "[i]t was well known that Defendant Nightingale often touched or tried to touch [Plaintiff] in unwelcome ways that he did not touch others."  Dkt. No. 109-15 at ¶ 3.  Cobb also stated that he "never saw [Defendant Nightingale] do any of this conduct toward male employees."  *Id.*  He described the contact as Nightingale "put[ting] his hands on her shoulders or otherwise encroach[ing] on her personal space."  *Id.*  Cobb stated that he and Plaintiff "engaged in 'vent sessions.'  She would experience crying spells, sometimes several times per week, lasting up to one hour."  *Id.* at ¶ 9.

In Daniel Dougher's affirmation, he stated he "observed Nightingale's unwanted touching of Plaintiff on more than one occasion.  His attitude towards her was different than towards men in that he tried to be physically controlling."  Dkt. No. 109-16 at ¶ 5.  Dougher also corroborated Plaintiff's testimony that Defendant Nightingale rubbed, not patted her back, when he shared news of a colleague's cancer diagnosis.  *See id.*; Dkt. No. 109-22 at ¶ 22.

Burlingame attested that "[p]rior to 2017, I did observe Nightingale touching Plaintiff in a way that he did not touch male officers at the firing range. . . .  I have never had him touch me in that way nor seen him touch other men in that fashion."  Dkt. No. 109-17 at ¶ 5.  Burlingame declared that he "heard [Nightingale] say sexist and misogynistic statements such as 'women shouldn't be cops.'  He always presented himself in the fashion that law enforcement is a 'man's job.'"  *Id.* at ¶ 3.  Burlingame described Nightingale's touching of Plaintiff as "touch[ing] the small of her back."  *Id.* at ¶ 5.  Burlingame asserted that "[t]he atmosphere and culture in the department under Nightingale and Winn was one of fear and retaliation.  Officers who dared to complain were given least desired shifts or subject to discipline."  *Id.* at ¶ 14.

Finally, Matt Ryan stated in his affirmation that he "observed Defendant Nightingale repeatedly touch Plaintiff or stand directly over her while she was on the computer or sitting in a chair."  Dkt. No. 109-18 at ¶ 4.  Ryan also stated that he "did not overserve [Defendant Nightingale] treat male officers in the same fashion, nor did I hear of anyone making such observations of other officers."  *Id.*  Ryan described one instance as follows: "Before we had even begun shooting, he approached her from behind, put his arms around her from behind, held his body against hers and wrapped his arms around her with his left and right hands on her arms as if to show her how to hold the firearm.  I had never seen that done before."  *Id.* at ¶ 5.  Ryan also observed Nightingale stand over Plaintiff and place his hands on her back or shoulder.  *See id.* at ¶ 6.  Ryan described the "atmosphere []as such that you had to tolerate Nightingale and Winn - or you're going to be blackballed.  Nightingale was someone who had the full support of the Chief and in fact was promoted to Captain after Officer Arnold finally made a complaint."  *Id.*

Viewing the evidence in the light most favorable to Plaintiff, this is sufficient evidence that would allow a reasonable fact finder to determine that Defendant Nightingale's alleged conduct would not have occurred but-for Plaintiff's gender.

However, Plaintiff's hostile work environment claims fail as a matter of law because there is insufficient evidence that the alleged incidents were severe or pervasive enough to meet the objective standard. Plaintiff alleges that Defendant Nightingale's harassing conduct occurred over the course of her employment and did not cease until Defendant Winn spoke to Defendant Nightingale about Plaintiff's complaint in February of 2019. *See* Dkt. No. 109-22 at ¶ 26. Plaintiff asserts that there were "six instances of sexual harassment by Nightingale" that she documented between 2017 and 2019 and reported in her 2019 work complaint. *Id.* at ¶ 17. She states that there were other instances prior to this time frame that she did not document. *See id.* In her affirmation, Plaintiff states as follows:

> The incidents of Defendant Nightingale's touching were not isolated incidents given the sporadic amount of time I had contact with him. His conduct was frequent and noticeable enough that it became a running joke amongst my co-workers, with them stating in words or substance that "he doesn't touch me like that."

Dkt. No. 109-14 at ¶ 9. The contact is described by Plaintiff and her fellow officers as "touching" or "putting his hands on" Plaintiff's shoulder or back, "rubbing" her back on one occasion, "bumping" her forearm, and one instance of "putt[ing] his arms around her from behind, h[olding] his body against hers and wrap[ing] his arms around her with his left and right hands on her arms as if to show her how to hold the firearm." Dkt. No. 109-18 at ¶ 5; Dkt. No. 109-11 at 235-36, 241-48; Dkt. No. Dkt. No. 109-17 at ¶ 5; Dkt. No. 109-15 at ¶ 3.

Generally, courts have concluded that sporadic or incidental incidents of conduct, like those alleged by Plaintiff, are insufficient to establish that discriminatory conduct is pervasive.

*See Ricard v. Kraft General Foods*, No. 92-CV-2256, 1993 WL 385129, *3 (S.D.N.Y. Mar. 16, 1993) *aff'd,* 17 F.3d 1426 (2d Cir. 1994) (finding that four "sexually-oriented incidents" over a period of twelve months did not create an actionable hostile work environment);  *Lucas v. South Nassau Communities Hosp.*, 54 F. Supp. 2d 141, 147-49 (E.D.N.Y. 1998) (granting summary judgment as to the plaintiff's state law hostile work environment claim where, over the course of twenty-one months, supervisor allegedly brushed against the plaintiff three times, touched the plaintiff with her hand on three occasions, touched the plaintiff's back or shoulder on five-to-seven occasions, suggested that the plaintiff wanted to go to bed with her, asked the plaintiff the color of his underwear on two to three occasions, and said "fuck you" twice); *Feingold v. New York*, 366 F.3d 138, 150 (2d Cir. 2004) (finding that, over the course of eight months, routine, "almost daily," "discriminatory intimidation, ridicule, and insult" because of the plaintiff's religion was sufficiently pervasive that a reasonable factfinder could conclude that the plaintiff was subjected to a hostile work environment).

Part of the hostile work environment inquiry concerns whether the conduct is a way in which coworkers "routinely interact," or whether "it is not conduct that is normal for the workplace." *Redd v. New York Div. of Parole*, 678 F.3d 166, 179 (2d Cir. 2012) (quotation omitted).  "'When entering a workplace, reasonable people expect to have their autonomy circumscribed in a number of ways; but giving up control over who can touch their bod[ies] is usually not one of them.'"  *Id.* (quoting *Patton v. Keystone RV Co.*, 455 F.3d 812, 816 (7th Cir. 2006)) (concluding that contact could not be categorized as "incidental" when "[t]he first occurred after Redd had been called into Washington's office; the second occurred when Redd and another PO were talking in a hallway, and Washington came up to Redd and rubbed up against Redd's

breasts; the third occurred when Washington crossed a room to where Redd was working at a computer, and reached over and touched Redd's breasts").

Here, the alleged incidents occurred when Defendant Nightingale was instructing on firearms, in a meeting sitting next to Plaintiff, or showing her something on his phone that was not of an offensive or sexual nature. "There is neither a threshold magic number of harassing incidents that gives rise, without more, to liability as a matter of law, nor a number of incidents below which a plaintiff fails as a matter of law to state a claim." *Dash v. Board of Educ. of City School Dist. of New York*, 238 F. Supp. 3d 375, 386 (E.D.N.Y. 2017) (quoting *Howley v. Town of Stanford*, 217 F.3d 141, 154 (2d Cir. 2000)). "The objective hostility of a work environment depends on the totality of the circumstances." *Petrosino v. Bell Atlantic*, 385 F.3d 210, 221 (2d Cir. 2004) (citation omitted); *see also Dash*, 238 F. Supp. 3d at 391 (denying summary judgment not based solely on the severity or pervasiveness of alleged conduct, but the totality of the circumstances). The present record is lacking evidence of pervasive conduct compared to those cases which have allowed a hostile work environment to proceed to trial or concluded as a matter of law that conduct was pervasive. *See Vito v. Bausch & Lomb Inc.*, 403 Fed. Appx. 593, 596 (2d Cir. 2010) (concluding "that the record before us is insufficient to sustain a hostile work environment claim" where the plaintiff alleged that her coworker "once approached her from behind as she sat at her workstation on a chair that had a low backrest and no armrests" and pushed against the back of her chair and touched part of her back and side" and "on at least two separate occasions [] touched her shoulder").

There is also little in the record to suggest that the conduct was sufficiently severe. Plaintiff states that there was "offensive touching of her body, including [her] arms, shoulders, and back." Dkt. No. 110 at 1. Generally, such instances of touching are not found to be

sufficiently severe to sustain a hostile work environment claim.  *See Parrish v. Sollecito*, 249 F.

Supp. 2d 342, 349 (S.D.N.Y. 2003) (finding that isolated incidents of rubbing an arm or shoulder

do not equate to the severity of a supervisor's repeated touching of a subordinates inner thigh over

the course of a year); *Redd*, 678 F.3d at 177 ("[A] hand on the shoulder, a brief hug, or a peck on

the cheek—would normally be unlikely to create a hostile environment. . . .  And even more

intimate or more crude physical acts—a hand on the thigh, a kiss on the lips, a pinch of the

buttocks—may be considered insufficiently abusive to be described as 'severe' when they occur in

isolation") (quoting *Patton*, 455 F.3d at 816).  Plaintiff does not allege offensive contact with any

intimate parts of her body that typically lead courts to more easily conclude that the alleged

conduct was severe.  *See Redd*, 678 F.3d at 17 ("[D]irect contact with an intimate body part

constitutes one of the most severe forms of sexual harassment"); *Zaja v. SUNY Upstate Med.

Univ./Upstate Healthcare Ctr.*, No. 5:20-CV-337, 2022 WL 4465498, *4 (N.D.N.Y. Sept. 26,

2022) (finding female employees' repeated touching of the plaintiff's buttocks, even after the

plaintiff requested that they stop, and placing of breasts on the plaintiff's shoulder to be

sufficiently severe); *Raspardo v. Carlone*, 770 F.3d 97, 119 (2d Cir. 2014) ("[F]our principal

incidents, including unwanted touching and vulgar comments in front of other officers, when

combined with the 'over ten' additional comments about [plaintiff's] body, all over a period of just

one year, would be amply sufficient to permit a jury to find a sexually hostile work

environment").

　　　　Numerous cases have concluded that less overtly sexualized conduct in the workplace,

like that alleged by Plaintiff, and corroborated by her coworkers, is not severe and pervasive.

*Compare Roundtree v. Securitas Sec. Servs., Inc.*, No. 3:10-CV-778, 2012 WL 631848, *7 (D.

Conn. Feb. 27, 2012) ("The Court finds that no reasonable juror could deem this conduct

sufficiently severe and pervasive to materially alter the terms and conditions of Roundtree's employment.  First, the court notes that, while Roundtree characterizes Gibsons' behavior as 'sexual' . . . and Bibb's as 'inappropriate' . . . the physical acts he describes—touching his shoulders, laying a head on his shoulder—are not overtly sexual"); *Beale v. Mount Vernon Police Dep't*, 895 F. Supp. 2d 576, 580, 588 (S.D.N.Y. 2012) ("In May 2006, while Plaintiff was either answering the phone or attending to a civilian at a service window, Rella crumpled up a piece of paper and placed it under the shoulder epaulet on Plaintiff's uniform. . . .  Rella did not touch Plaintiff anywhere aside from her shoulder. . . .  Plaintiff does not allege that allege that Rella's action of stuffing a crumpled piece of piece[sic] under her shoulder epaulet was sexual"); *Hilt-Dyson v. City Of Chicago*, 282 F.3d 456, 463-64 (7th Cir. 2002) ("In particular, the back rubbing incidents at issue in this case, although inappropriate behavior in the workplace, do not constitute by themselves actionable harassment under Title VII . . .  On each occasion, the back rubbing incident was brief and involved no threats, intimidation or humiliation"); *with Maher v. Alliance Mortg. Banking Corp.*, 650 F. Supp. 2d 249, 264-65 (E.D.N.Y. 2009) ("A jury considering the totality of the circumstances could reasonably find Agoglia's actions were frequent, humiliating, and altered the conditions of her employment" where the defendant touched the plaintiff's butt, shoulder, neck, blew in her ear, indicated grabbing of breasts, and placed a cigar in her blouse); *Johnson v. J. Walter Thompson U.S.A., LLC*, 224 F. Supp. 3d 296, 309 (S.D.N.Y. 2016) ("Considering the alleged conduct in context, Johnson has pleaded enough to support a plausible inference that an objectively hostile work environment existed" where the defendant rubbed Plaintiff's shoulders, touched her face, and made repeated comments regarding rape).

Although Plaintiff was undoubtedly uncomfortable and Nightingale's conduct was inappropriate, a reasonable fact finder could not conclude that the conduct was "sufficiently

severe or pervasive to alter the conditions of [Plaintiff's] employment." *Torres*, 116 F.3d at 631

(quoting *Harris*, 510 U.S. at 21); *see also Capaldo v. Remington Long Island Emps.*, No. 18-CV-

2746, 2023 WL 2710251, *12 (E.D.N.Y. Mar. 30, 2023) (concluding that the plaintiff "alleges

only 'casual contact that might be expected among friends'" where the defendant laid his head on

the plaintiff's shoulder, wrapped his arms around her, asked her out numerous times, and told her

she looked beautiful) (quotation omitted); *Sowash v. Marshalls of MA, Inc.*, No. 7:19-CV-361,

2021 WL 2115359, *7 (W.D. Va. May 25, 2021), *aff'd*, No. 21-1656, 2022 WL 2256312 (4th Cir.

June 23, 2022) ("While Hughes touched Sowash's arm a number of times, he did not proposition

her or make any sexual comments to her. . . .  [T]he one kiss on the cheek was inappropriate, but

it does not create severe or pervasive sexual harassment") (citations omitted).

      Based on the foregoing, Defendants' motion for summary judgment is granted as to

Plaintiff's § 1983 and NYSHRL hostile work environment claims.

                **b. Town Liability**

      Defendants argue that Plaintiff's claims against the Town fail as a matter of law because

she cannot demonstrate that Defendant Winn was deliberately indifferent to her complaints.  *See*

Dkt. No. 105 at 25.  Plaintiff responds, noting that "[i]t is undisputed that Defendant Winn failed

to follow Town policy when he received Plaintiff's first complaint of harassment by not filing a

formal complaint or conducting an investigation."  Dkt. No. 110 at 15.  Plaintiff contends that

Defendant Winn was deliberately indifferent because he "was unsupportive of Plaintiff.  She

expressed fear of retaliation and contrary to his testimony, he never assured her that she would not

be subjected to such adverse treatment." *Id.* at 16.

      "'To establish liability under *Monell*, a plaintiff must show that he suffered the denial of a

constitutional right that was caused by an official municipal policy or custom.'"  *A.S. v. City Sch.*

*Dist. of Albany*, 585 F. Supp. 3d 246, 281 (N.D.N.Y. 2022) (quoting *Bellamy v. City of New York*, 914 F.3d 727, 756 (2d Cir. 2019)).  One route to evidence a municipal policy or custom is through facts that show "a failure to train or supervise that amounts to 'deliberate indifference' to the rights of those with whom the municipality's employees interact."  *Id.* (quoting *City of Canton v. Harris*, 489 U.S. 378, 388 (1989)).  "Deliberate indifference may be found both 'when the defendant's response to known discrimination 'is clearly unreasonable in light of the known circumstances,' . . . and when remedial action only follows after 'a lengthy and unjustified delay.'"  *Hayut v. State Univ. of New York*, 352 F.3d 733, 751 (2d Cir. 2003) (quoting *Gant v. Wallingford Bd. of Educ.*, 195 F.3d 134, 141 (2d Cir. 1999); B*runeau v. South Kortright Cent. Sch. Dist.*, 163 F.3d 749, 761 (2d Cir. 1998)) (additional quotation and quotation marks omitted); *see also Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 128 (2d Cir. 2004) ("[P]laintiffs' evidence must establish only that a policymaking official had notice of a potentially serious problem of unconstitutional conduct, such that the need for corrective action or supervision was 'obvious,' . . . and the policymaker's failure to investigate or rectify the situation evidences deliberate indifference, rather than mere negligence or bureaucratic inaction") (quotation omitted).

        "To prevail on a municipal liability claim, a plaintiff must show 'a direct causal link between a municipal policy or custom and the alleged constitutional deprivation.'"  *A.S.*, 585 F. Supp. 3d at 281 (quoting *Outlaw v. City of Hartford*, 884 F.3d 351, 373 (2d Cir. 2018)).  Where a plaintiff "fail[s] to establish individual liability on [] claims of discrimination, retaliation, hostile work environment, and deprivation of due process, [a] claim of liability against the City for these purported violations fails as a matter of law."  *Wright v. City of Syracuse*, 611 Fed. Appx. 8, 12 (2d Cir. 2015) (citing *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986)).

First, because the Court finds dismissal is required as to Plaintiff's hostile work environment claims, dismissal is likewise required as to her municipal claims based on a deliberate indifference theory to those complaints.

Second, even if dismissal was not required for that reason, Plaintiff has not produced evidence that Defendant Winn's actions meet the "stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 410 (1997). "Specifically, '[i]n the context of sexual harassment, inaction may be actionable, and failure to promptly and properly respond to complaints may expose a supervisor or employer to liability under anti-discrimination laws.'" *Cowan v. City of Mount Vernon*, 95 F. Supp. 3d 624, 642 (S.D.N.Y. 2015) (quoting *Burhans v. Lopez*, 24 F.Supp.3d 375, 382 (S.D.N.Y. 2014)). Plaintiff cited to *Cowan* to support her argument that "[s]ummary judgment should be denied where there is evidence of municipal liability based on failure to investigate complaints of sexual harassment." Dkt. No. 110 at 15. In *Cowan*, the defendant supervisor "did not investigate her claims, but rather informed Plaintiff that she should not complain of the harassment." *Cowan*, 95 F. Supp. 3d at 642. "Indeed, Plaintiff testified that [her supervisor] requested that she re-write her formal complaint in March 2011 to omit the allegations of sexual harassment." *Id.* Plaintiff's federal complaint alleged that her coworker "sexually harassed Plaintiff, culminating in a vicious assault," and "on a daily basis, [he] made comments about Plaintiff's body, her appearance, and his desire to have sexual relations with her." *Id.* at 632. Plaintiff's coworker "also physically touched Plaintiff in a sexual manner, including feeling her back, pinching her buttocks, slapping and/or squeezing her buttocks, and grabbing her chest." *Id.* Plaintiff initially included the sexual harassment in her workplace complaint, but her supervisor told "her that she 'did not have enough' to sustain a

26

sexual harassment complaint and that she should produce another complaint that did not contain the sexual harassment content." *Id.* at 633 (quotation omitted). Plaintiff then sent her supervisor an "email, which stated that it was Plaintiff's 'initial complaint of hostility in the workplace.'" *Id.* (quotation omitted).

*Cowan* is distinguishable from the case now before the Court. Here, Plaintiff admits in response to Defendants' statement of material facts that "on January 24, 2019, as part of Plaintiff's annual performance review, she reported two additional incidents involving Captain Nightingale. . . . Chief Winn assured Plaintiff that she would be protected against retaliation, he reminded her to report any further concerns of unwanted conduct." Dkt. No. 109-22 at ¶ 18. She agrees that when she first complained of Defendant Nightingale's conduct, Defendant Winn "told Plaintiff that he would place a 'summary' of her complaint in a sealed envelope in her personnel file." *Id.* at ¶ 16. Although Defendant Winn later told Plaintiff's to cross out the word "Sexual" on her formal complaint, she still narratively explained the instances of unwanted touching and she does not present any evidence that the conduct was sexually motivated. *Id.* at ¶¶ 19-20. Plaintiff wanted the conduct to stop, and she agrees that Defendant Winn spoke to Defendant Nightingale and the conduct ceased. *See* Dkt. No. 109-22 at ¶¶ 21-26. This is not the type of conduct that meets the "stringent standard of fault." *Hulett v. City of Syracuse*, 253 F. Supp. 3d 462, 500 (N.D.N.Y. 2017) (quoting *Brown v. City of N.Y.*, No. 13-CV-6912, 2017 WL 1390678 *13 (S.D.N.Y. Apr. 17, 2017)) (additional quotation omitted). "Evidence that the [municipality] took steps to rectify the problem, but failed to do so, cannot insulate it from liability if the [municipality's] steps 'are proven so meaningless or blatantly inadequate to the task . . . notwithstanding [its] nominal supervisory efforts.'" *Stevens v. City of Bridgeport*, 607 F. Supp. 2d 342, 356 (D. Conn. 2009) (quoting *Reynolds v. Giuliani*, 506 F.3d 183, 192 (2d Cir. 2007))

(denying summary judgment where "the Department engaged in minimal efforts to stop" the harassment where the supervisor told one plaintiff to "dress down" and told the harasser that another plaintiff "was 'nutso' and that he should just 'stay away from her,' [the supervisor] may even have exacerbated the harassment by expressing to [the harasser] that the Department did not take it seriously").  Here, Defendant Winn wrote a confidential summary of Plaintiff's complaint, instructed her to file a formal complaint, spoke with Defendant Nightingale, and the conduct ceased.  Plaintiff has not established that this conduct amounts to deliberate indifference.

Plaintiff also presents no case law to support her contention that the Town can be liable for Defendant Winn's conduct because he "was unsupportive of Plaintiff.  She expressed fear of retaliation and contrary to his testimony, he never assured her that she would not be subjected to such adverse treatment."  Dkt. No. 110 at 16.  Plaintiff argues that "[t]he law should not allow an employer to escape liability when a victim reports harassment but expresses fear of pursuing a complaint and chooses not to proceed because the employer is unsupportive and refuses to even assure the employee that they will not be retaliated against."  *Id.*  However, she provides no authority which concludes that being "unsupportive" amounts to deliberate indifference.  *Id.*

Based on the foregoing, summary judgment is warranted as to Plaintiff's claims against the Town.

### 2. Disparate Treatment

Plaintiff claims that she was subjected to disparate treatment based on her gender because she was treated less favorably than male police officers.  *See* Dkt. No. 110 at 17.  Specifically, Plaintiff argues that she was denied training, instruction, and overtime opportunities that were afforded to less qualified male officers.  *See id.*; *see also* Dkt. No. 96 at ¶ 16.

As with hostile work environment claims, "[t]he standards for deciding the state law claims for disparate treatment are also the same as the standards for § 1983[.]" *Demoret*, 451 F.3d at 153. As such, Plaintiff's state and federal disparate treatment claims will be considered together. *See id.* (dismissing state law disparate treatment claims because the district court's dismissal of federal disparate treatment claims was proper).

"Courts analyze claims of disparate treatment claims under the familiar burden shifting framework of *McDonnell Douglas*[.]" *Id.* at 151. Accordingly, a plaintiff must first establish a *prima facie* case of discrimination showing "that: (1) she is a member of a protected class; (2) her job performance was satisfactory; (3) she suffered adverse employment action; and (4) the action occurred under conditions giving rise to an inference of discrimination." *Id.* If such a showing is made, "the burden shifts to the defendant employer to provide a legitimate non-discriminatory reason for the action. If the defendant makes such a showing, the burden shifts back to the plaintiff to prove discrimination, for example, by showing that the employer's proffered reason is pretextual." *Id.* "A showing of disparate treatment—that is, a showing that an employer treated plaintiff less favorably than a similarly situated employee outside his protected group—is a recognized method of raising an inference of discrimination for the purposes of making out a *prima facie* case." *Hakeem v. Parkinson*, 523 Fed. Appx. 19, 20-21 (2d Cir. 2013). "To establish an inference of discriminatory intent through disparate treatment, a plaintiff must allege that 'she was similarly situated in all material respects to the individuals with whom she seeks to compare herself." *Kunik v. New York City Dept. of Education*, 436 F. Supp. 3d 684, 697 (S.D.N.Y. 2020) (quoting *Brown v. Daikin Am. Inc.*, 756 F.3d 219, 230 (2d Cir. 2014)). "An employee is similarly situated to co-employees if they were (1) 'subject to the same performance evaluation and

discipline standards' and (2) 'engaged in comparable conduct.'" *Ruiz v. Rockland*, 609 F.3d 486, 494 (2d Cir. 2010) (quotation omitted)

Defendants do not dispute that Plaintiff has established the first two elements of a *prima facie* case for gender discrimination—that she is a member of a protected class and her job performance was satisfactory. *See generally* Dkt. Nos. 105, 113-3. With regard to the third and fourth elements of her *prima facie* case, Defendants argue that Plaintiff has failed to establish that she suffered any adverse employment actions or that there is an inference of discrimination underlying the alleged actions. *See* Dkt. No. 105 at 6-13.

"A denial of training is an adverse employment action 'in circumstances where an employer denies necessary job training to an employee and the terms and conditions of his employment are thereby harmed.'" *Ocasio v. Mohawk Valley Community College*, No. 6:20-CV-1355, 2021 WL 4477241, *8 (N.D.N.Y. Sept. 30, 2021) (quoting *Carpenter v. City of Mount Vernon*, 198 F. Supp. 3d 272, 280 (S.D.N.Y. 2016)). A denial of training opportunities must have "caused [a plaintiff's] opportunities for career growth or compensation to be affected[,]" to constitute harm to the terms and conditions of a plaintiff's employment. *Id.* (quoting *Carpenter*, 198 F. Supp. 3d at 280). "An adverse employment action may or may not entail economic loss, but there must be a link between the discrimination and some 'tangible job benefits' such as 'compensation, terms, conditions or privileges' of employment." *Alfano*, 294 F.3d at 373 (quoting *Karibian v. Columbia Univ.*, 14 F.3d 773, 778 (2d Cir. 1994)).

Plaintiff states that her "training assignment" with the Department "was of a nominal nature" and was only offered after she complained about Defendant Nightingale's conduct. Dkt. No. 110 at 19. She notes that her instructing assignments were with "civilian staff." *Id.* Plaintiff offers no evidence that any of the alleged denials of training or instruction opportunities had an

effect on her compensation, opportunities for career growth, or some "tangible job benefit[.]" *Alfano*, 294 F.3d at 373; Dkt. No. 110 at 19.

In her second amended complaint, Plaintiff alleges that she was subject to disparate treatment because Defendant Nightingale denied her overtime opportunities. *See* Dkt. No. 96 at ¶ 16. Plaintiff offers no evidence in support of this contention, stating only that "Nightingale subjected Plaintiff to disparate treatment by denying overtime." *Id.* Defendants assert that it is "undisputed that Captain Nightingale was not responsible for the assignment of Plaintiff's overtime[.]" Dkt. No. 105 at 19. Plaintiff provides no evidence that Defendant Nightingale was responsible for the approval or denial of her overtime opportunities. *See* Dkt. No. 96. Defendants argue that Plaintiff "cannot demonstrate that Captain Nightingale denied her overtime opportunities, let alone that any such opportunities were denied because of her sex or gender." Dkt. No. 105 at 19. Plaintiff does not address Defendants' argument in her response to Defendants' motion for summary judgment. *See* Dkt. No. 110. For these reasons, Plaintiff has failed to support her disparate treatment claims based on allegations that that she was denied overtime opportunities.

Further, Plaintiff offers little evidence as to how male officers within the police force were situated relative to her. *See* Dkt. No. 96 at ¶¶ 16, 43, 47. Plaintiff provides personal observations that male officers were invited and encouraged to attend trainings but does not produce sufficient evidence as to those officers' position within the police force relative to Plaintiff. *See* Dkt. No. 109-22 at ¶ 10. Burlingame, a former Lieutenant under the supervision of Defendant Nightingale, does give some support to Plaintiff's contentions in his affirmation. *See* Dkt. No. 109-17 at ¶¶ 6, 7, 10. Burlingame stated that "Nightingale would often send his friends to more desirable training." *Id.* at ¶ 6. Burlingame also indicated that he "went to 'Street Survival School' in or

about 2014 with several other officers" and that "Plaintiff requested this training at least three times and was ignored." *Id.* at ¶ 7.  However, again, there is no evidence that this impacted Plaintiff's career growth or compensation.

Plaintiff asserts that she was treated differently than "less-qualified male officers."  Dkt. No. 96 at ¶ 16.  She does not explain how anyone was "less qualified."  *Id.*  Plaintiff was a police officer.  Cobb was as well.  *See* Dkt. No. 109-15 at ¶ 1.  Dougher does not identify his rank, but states only that he is retired.  *See* Dkt. No. 109-16 at ¶ 1.  Burlingame was a lieutenant when he retired.  *See* Dkt. No. 109-17 at ¶ 1.  Ryan was a police officer.  *See* Dkt. No. 109-18 at ¶ 2.  Plaintiff also does not identify the training and instructional opportunities that specific employees, who were "less qualified," were given that she was not.

Plaintiff argues "[i]t is also not necessary that she identify an employee more favorably treated and who was similarly situated" because "'[f]or it may be the case that a co-worker or supervisor treats both men and women badly, but women worse.'"  Dkt. No. 110 at 18 (quoting *Brown v. Henderson*, 257 F.3d 246, 253 (2d Cir. 2001)).  In *Brown*, the Second Circuit's discussion about discrimination claims did include commentary that "discrimination against one employee cannot be cured, or disproven, solely by favorable, or equitable, treatment of other employees of the same race or sex."  *Brown*, 257 F.3d at 252.  However, that discussion was in the context of analyzing alleged hostile work environment claims.  *See id.*  In the context of a disparate treatment claim, the Second Circuit has explained that "discriminatory intent can be shown by either direct evidence of discriminatory animus or circumstantial evidence of such animus, including by showing disparate treatment among similarly situated employees."  *Radwan v. Manuel*, 55 F.4th 101, 132 (2d Cir. 2022) (citing *Gordon v. N.Y.C. Bd. of Educ.*, 232 F.3d 111, 117 (2d Cir. 2000)).  "Direct evidence of discriminatory animus includes employer policies,

practices, or decisions that expressly rely upon a protected characteristic." *Simons v. Yale Univ.*, No. 3:19-CV-1547, 2024 WL 182208, *8 (D. Conn. Jan. 17, 2024) (citing *Young v. United Parcel Serv., Inc.*, 575 U.S. 206, 213 (2015)).

"[T]he standard for comparing conduct requires a reasonably close resemblance of the facts and circumstances of plaintiff's and comparator's cases, rather than a showing that both cases are identical.  In other words, the comparator must be similarly situated to the plaintiff 'in all material respects.'" *Radwan*, 55 F.4th at 132 (quoting *Ruiz v. Cnty. of Rockland*, 609 F.3d 486, 494 (2d Cir. 2010)) (additional quotation marks omitted).  Plaintiff's broad assertion that she was treated less favorably than male officers is not sufficient to identify similarly situated comparators who were afforded opportunities that she was denied.  *See Watson v. Richmond Univ. Med. Ctr.*, 408 F. Supp. 3d 249, 264 (E.D.N.Y. 2019) (finding that the plaintiff's vague reference to groups of potential comparators was not adequate to permit the court to determine whether any potential comparators were similarly situated to the plaintiff).

Plaintiff admits that she "is unfamiliar with other Officers' training records and lacks knowledge of anyone who received more training opportunities than she did."  Dkt. No. 109-22 at ¶ 8.  However, she argues that she should not be faulted for failing to produce evidence of male officers' training and instruction opportunities because Magistrate Judge Miroslav Lovric denied Plaintiff's motion to compel production of other employees' training records.  *See* Dkt. No. 110 at 18; *see also* Dkt. No. 86.  Plaintiff states that "[t]he Court should not permit Defendants to now fault Plaintiff for not producing the information they themselves asserted was irrelevant and deprived her access to."  Dkt. No. 110 at 18.  Plaintiff did not appeal Magistrate Judge Lovric's denial of her motion to compel.  Plaintiff also did not request the records when the Court

reopened discovery following the Fourth Department's decision.  *See* Text Minute Entry 01/11/2024.

Finally, Plaintiff's contention that she was not invited to "Street Survival" training "because they would have to get two separate hotel rooms because she is female and could not share a room," is evidence of a decision being expressly based on gender.  Dkt. No. 109-22 at ¶ 4.  However, Plaintiff has not established that her inability to attend "Street Survival" training negatively impacted her salary, career growth, or other work opportunities.  Because Plaintiff has not demonstrated that she suffered an adverse employment action nor identified sufficiently similar comparators, the Court grants Defendants' motion for summary judgment as to Plaintiff's § 1983 and NYSHRL disparate treatment claims.

### 3. Constructive Discharge

In Plaintiff's second amended complaint she alleges that she "was forced to resign from Camillus PD on August 8, 2019 to escape this hostility and protect her health."  Dkt. No. 96 at ¶ 23.  In Defendants' motion for summary judgment, they argue Plaintiff's resignation was voluntary and that because she is unable to demonstrate that she was subject to a hostile work environment, she cannot demonstrate a constructive discharge claim.  *See* Dkt. No. 105 at 32.  Defendants contend in their reply that Plaintiff has abandoned her constructive discharge claim because she "fails to address Defendants' argument that she was not constructively discharged" in her response to Defendants' motion for summary judgment.  Dkt. No. 113-3 at 5.

As Defendants note, a claim may be considered abandoned in the event a counseled party submits a partial response to a dispositive motion.  *See Jackson v. Fed. Exp.*, 766 F.3d 189, 197-98 (2d Cir. 2014); *see also* Dkt. No. 113-3 at 5.  Plaintiff did not state the words "constructive discharge" in her response to Defendants' motion.  *See* Dkt. No. 110.  However, Plaintiff does

refer to her inability to work for the Town because "[t]he conduct at issue here was physically humiliating and unreasonably interfered with Plaintiff's work to the point that she could no longer work at Camillus," and, as a result, she "experienced extreme stress and resigned from the Camillus police department." *Id.* at 11-12. Based on these assertions, the Court will examine Plaintiff's constructive discharge claims to determine whether summary judgment is warranted.

"A 'constructive discharge' occurs when an employer 'deliberately makes an employee's working conditions so intolerable that the employee is forced into an involuntary resignation.'" *Hockeson v. New York State Office of General Services*, 188 F. Supp. 2d 215, 220 (S.D.N.Y. 2002) (quoting *Pena v. Brattleboro Retreat*, 702 F.2d 322, 325 (2d Cir. 1983)). Constructive discharge claims "aris[e] out of particularly pronounced hostile work environments." *Pryor v. Jaffe & Asher*, 992 F. Supp. 2d 252, 257 (S.D.N.Y. 2014). "Constructive discharge claims are often premised on the same type of non-discrete conduct underlying a hostile work environment claim, although the standard for constructive discharge is higher." *Bader v. Special Metals Corp.*, 985 F. Supp. 2d 291, 309 (N.D.N.Y. 2013) (citing *Mandel v. Champion Int'l Corp.*, 361 F. Supp. 2d 320, 327 (S.D.N.Y. 2005)). Courts in the Second Circuit have concluded that where a plaintiff fails to sustain a claim for hostile work environment, constructive discharge claims based upon the existence of the same alleged hostile work environment also fail. *See Fincher v. Depository Trust and Clearing Corp.*, 604 F.3d 712, 725 (2d Cir. 2010); *Pryor*, 992 F. Supp. 2d at 262. In the present instance, Plaintiff has failed, as a matter of law, to support her claims of a hostile work environment and therefore summary judgment is also warranted as to her constructive discharge claims. *See Pennsylvania State Police v. Suders*, 542 U.S. 129, 149 (2004) ("Creation of a hostile work environment is a necessary predicate to a hostile-environment constructive discharge case"); *see also Brown v. Montefiore Med. Ctr.*, No. 19-CV-11474, 2022 WL 392313, *5 (S.D.N.Y. Feb.

09, 2022); *Brooks v. Doe Fund, Inc.*, No. 17-CV-3626, 2020 WL 13659079, *14 n.21 (E.D.N.Y. Mar. 31, 2020).

**C.    Retaliation**

Retaliation claims, like discrimination claims, brought under § 1983 and the NYSHRL are subject to the burden-shifting *McDonnel Douglas* framework. *See Kwan v. Andalex Group LLC*, 737 F.3d 834, 843 (2d Cir. 2013). As such, a plaintiff must first establish a *prima facie* case of retaliation. *See Hicks v. Baines*, 593 F.3d 159, 164 (2d Cir. 2010). For a plaintiff to establish a *prima facie* case of retaliation she must show that "(1) she engaged in protected activity; (2) the employer was aware of that activity; (3) the employee suffered a materially adverse action; and (4) there was a causal connection between the protected activity and that adverse action." *Kelly* v. *Howard I. Shapiro & Associates*, 716 F.3d 10, 14 (2d Cir. 2013) (quoting *Lore v. City of Syracuse,* 670 F.3d 127, 157 (2d Cir. 2012)).

Defendants argue that Plaintiff "disavowed her retaliation claims" during her deposition. Dkt. No. 105 at 23. During her deposition, Defendants' counsel asked, "Was there any retaliation after February of 2019?" Dkt. No. 109-11 at 272. Plaintiff responded, "I don't recall any." *Id.*

Before this question and response, Plaintiff was speaking specifically of Defendant Nightingale's alleged conduct. *See id.* at 271. Plaintiff later explained that "the overall work environment was pretty awful" and that she "started to develop severe anxiety" as a result of being "forced to continue to work[] with Captain Nightingale and Chief Winn with the knowledge that no action would [sic] taken to protect me from further adverse treatment." *Id.* at 27-273. Her testimony suggests that while she did not recall any retaliation from Defendant Nightingale, she did feel as though Defendant Winn and the Town's alleged failure to investigate Plaintiff's complaint was a form of retaliation. This is consistent with Plaintiff's submissions to this Court

36

where she either directly admits that Defendant Nightingale did not engage in retaliation or does not address what role he had in any alleged retaliation.  *See* Dkt. No. 109-22 at ¶ 27; Dkt. No 110 at 17.  Plaintiff has not presented any evidence that Defendant Nightingale retaliated against her, and summary judgment is appropriate in this regard.

With respect to Plaintiff's retaliation claims against Defendant Winn and the Town, they cannot be sustained because Plaintiff does not allege any materially adverse employment actions stemming from her engagement in a protected activity.[5]  "In the context of a retaliation claim, a 'materially adverse' employment action is an action that 'might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'"  *Starzynski v. Stanley Black & Decker*, No. 21-CV-3040, 2022 WL 17825920, *1 (2d Cir. 2022).  Plaintiff asserts that Defendant Winn and the Town's act of "refusal to take her complaints of sexual harassment seriously" constitutes a materially adverse employment action.  Dkt. No. 110 at 19.  She argues that "[t]hey failed to investigate, interview any witnesses, or provide reassurance to Plaintiff that her complaints would be addressed."  *Id.*  Plaintiff concedes, however, that all unwanted conduct stopped following Defendant Winn's conversation with Defendant Nightingale.  *See* Dkt. No. 109-22 at ¶¶ 25-26.

Even accepting Plaintiff's assertions as true, "a failure to investigate a protected complaint is generally not a materially adverse employment action."  *Graham v. Macy's, Inc.*, No. 14-CV-3192, 2016 WL 354897, *8 n.7 (S.D.N.Y. Jan. 28, 2016) (citing *Fincher v. Depository Trust & Clearing Corp.,* 604 F.3d 712, 721 (2d Cir. 2010)); *see also Bianchi v. Rochester City Sch. Dist.*, No. 16-CV-6840, 2019 WL 4750424, *10 (W.D.N.Y. Sept. 30, 2019) (finding an inadequate

---

[5] Defendants do not dispute that Plaintiff engaged in a protected activity and that they were aware of the protected activity.  *See* Dkt. Nos. 105, 113-3.

investigation of a protected complaint not to be an adverse employment action). It is not to say "that failure to investigate a complaint cannot ever be considered an adverse employment action for purposes of a retaliation claim. It can be if the failure is in retaliation for some separate, protected act by the plaintiff." *Fincher*, 604 F.3d at 722; *see also Vasquez v. Yonkers Pub. Sch. Dist.*, No. 21-CV-4620, 2024 WL 1349227, *7 (S.D.N.Y. Mar. 29, 2024); *Doe v. St. Lawerence Univ.*, No. 8:23-CV-00426, 2024 WL 1116454, *17 (N.D.N.Y. Mar. 14, 2024). However, Plaintiff makes no claim that the alleged failure to investigate her complaint was in retaliation for any protected activity other than her making the complaint. *See* Dkt. No. 110 at 19.

Plaintiff states that "[r]e-assignments or change in job duties, including undesirable work assignments, are cognizable as retaliation." *Id.* at 21 (citations omitted). The Court agrees with that proposition. *See Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 71 (2006) ("[T]he EEOC has consistently found '[r]etaliatory work assignments' to be a classic and 'widely recognized' example of 'forbidden retaliation'") (quotation omitted). However, Plaintiff does not present evidence that she was subjected to an undesirable work assignment. The Supreme Court has explained that "reassignment of job duties is not automatically actionable. Whether a particular reassignment is materially adverse depends upon the circumstances of the particular case, and 'should be judged from the perspective of a reasonable person in the plaintiff's position, considering "all the circumstances."'" *Burlington*, 548 U.S. at 71 (quoting *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 81 (1998)). Plaintiff argues that she given training assignments to instruct "civilian staff on sexual harassment." Dkt. No. 110 at 5, 19. She states that she "was never given the opportunity to teach any classes in the department" until after she complained about Defendant Nightingale's conduct. *Id.* at 5. Plaintiff does not explain why her training assignments were "material adverse." She does not, for example, contend that certain

trainings "required more qualifications," was "more arduous and dirtier," or "was objectively considered a better job." *Burlington*, 548 U.S. at 71.  Nor does she assert that she was given less advantageous opportunities after she complained to Defendant Winn.  Instead, Plaintiff actually alleges that she was given additional instructional and training opportunities after she engaged in the protected activity.  *See* Dkt. No. 109-22 at ¶¶ 10-12.  Without evidence that she was subjected to worse conditions following her protected activity, summary judgment dismissing Plaintiff's retaliation claims is proper.

## IV. CONCLUSION

After carefully reviewing the record in this matter, the parties' submissions and the applicable law, and for the reasons stated herein, the Court hereby

**ORDERS** that Defendants' motion for summary judgment (Dkt. No. 92) is **GRANTED**; and the Court further

**ORDERS** that the Clerk of the Court shall enter judgment in Defendants' favor and close this case; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum-Decision and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

Dated:   August 26, 2024
             Albany, New York

Mae A. D'Agostino
U.S. District Judge